## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

No. 08-cv-08-00451-RPM

TLINGIT HAIDA REGIONAL HOUSING AUTHORITY,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN
     DEVELOPMENT (HUD);
SHAUN DONOVAN, Secretary of HUD;
DEBORAH A. HERNANDEZ, General Deputy Assistant Secretary for Public
and Indian Housing; and
GLENDA GREEN, Director, Office of Grants Management, National Office of
Native American Programs, Department of Housing and Urban Development,
Office of Public and Indian Housing,

Defendants.

## OPPOSITION TO DEFENDANTS' MOTION FOR RESTITUTION

**Judge Matsch: Why did HUD pay these judgments?**

**Mr. Jafek: I think they thought it was, you know, the equitable thing to do.[1]**

*       *       *

The Plaintiff tribes in the above-captioned matters respectfully oppose *Defendants' Motion for Restitution,* dated May 14, 2018 (hereinafter "*HUD Motion*").[2] As did the plaintiff in *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs,* 60 F.3d 867, 873-74 (1st Cir. 1995), HUD here seeks "restitution upon the hoary adage 'that a party against whom an erroneous judgment decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby.'"

But as the 1st Circuit warned in denying restitution in that case, while that "hoary adage" cannot be gainsaid:

> [I]t tells only half the tale. Restitution is not a matter of right, but a matter of sound equitable discretion [citations omitted]…**Because restitution is a creature of equity, a claimant can prevail only by showing that it will offend 'equity and good conscience' if the other party is permitted to retain the disputed funds**.

*Id.; emphasis added.*

---

[1] Audio Transcript, Motion and Status Conf., June 8, 2018 at 1:52:29.

[2] Due to the fact that this brief is being filed concurrently in multiple cases that are being coordinated by the Court, Plaintiffs have not set out the docket numbers of the pleadings but rather have referenced the filing dates.

Content with half-a-tale, HUD spends most of its *Motion* insisting that the government, too, may be entitled to restitution, relying on *Lastowski v. Spellings*, 443 F.3rd 930 (7th Cir. 2006). Leaving aside the fact that *Lastowski* was vacated in *University of Notre Dame v. Laskowski*, 551 U.S. 1160 (2007), the Tribes do not quarrel with that unremarkable proposition.

But the issue here is, rather, whether HUD is entitled to restitution *in these cases*. And, as the 1st Circuit has stressed, in restitution cases as well as any other equity proceeding:

> This emphasis on the particulars of each individual case is consistent with the central feature of equity jurisdiction: "the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis." *Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 321 (1st Cir. 1989) (*en banc*); see also *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 88 L. Ed. 754, 64 S. Ct. 587 (1944) ("The essence of equity jurisdiction has been the power . . . to mould each decree to the necessities of the particular case."); *Lussier v. Runyon*, 50 F.3d 1103, 1110 (1st Cir. 1995) (stating that "the hallmarks of equity have long been flexibility and particularity"), petition for cert. filed (U.S. June 5, 1995) (No. 94-1979). **Claims for restitution arising out of the vacation or reversal of a judgment are tested by the same standards as other claims for restitution.**

*Texaco Puerto Rico, supra* at 873-74; *emphasis added*. This *Response in Opposition* tells the other half of the tale, and it is divided as follows:

Section 1 demonstrates that the equities of these cases, and the public interest, militate against restitution;

Section 2 explains that, because of HUD's obstruction of the fact-finding process on remand, it is, at best, premature to decide whether certain funds were "at

[HUD's] disposal" when this court's original judgments were entered—an essential factual predicate to even considering the possibility of restitution;

Section 3 separately treats HUD's claims that the district court's equitable hands are tied here, because full restitution is "necessarily implied" in the 10th Circuit's remand. *HUD Motion* at 15;

Section 4 maintains that HUD is not entitled to restitution because its hands are unclean; and

Section 5 urges that this Court should use its singularly broad discretion in restitution cases to limit any restitution order in a manner consistent with "equity and good conscience." [3]   In these cases, should any restitution be required, equity would argue for: (i) reducing the amount of any restitution by the attorneys' fees expended by each tribe in successfully opposing HUD's pernicious claim of the summary right to seize previously-granted Indian housing funds; and (ii) allowing each tribe the same period of time to repay any remainder as HUD was allowed to wrongfully retain those seized funds in the first place (a period ranging between 6 to 13 years).

**1. The Equities of these Cases, and the Public Interest, Preclude Restitution**

**A. It is HUD's Burden to Prove that Equity Compels Restitution**

---

[3] *Williams v. Wash. Metro. Area Transit Com.,* 415 F.2d 922, 946 (D.C. Cir. 1968) (*en banc*).

As Justice Cardozo put it, the remedy of restitution is:

> [A] remedy which is equitable in origin and function . . . The claimant, to prevail, must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it . . . . The question no longer is whether the law would put him in possession of the money if the transaction were a new one. The question is whether the law will take it out of his possession after he has been able to collect it.

*Atlantic Coast Line R.R. Co. v. Florida,* 295 U.S. 301, 309 (1935).  To put it another way:

> Since restitution is essentially an equitable remedy, *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 158 U.S. App. D.C. 7, 485 F.2d 786, 825 (1973), *cert. denied*, 415 U.S. 935, 39 L. Ed. 2d 493, 94 S. Ct. 1451 (1974), the general principles governing the shaping and review of equitable decrees are fully applicable to awards of restitution.

*Thompson v. Washington,* 551 F.2d 1316, 1319 (D.C. Cir. 1977).

In deciding the equities of HUD's *Motion*, this Court's duty is to "weigh[] and balance[] the equities, and juxtapose[] the parties' rights with painstaking care." *Texaco Puerto Rico, supra* at 886.  Often that balance will result in denying restitution—as one would expect, given that the burden of proof starts, and remains, with the party seeking restitution.   To put it in suitably absolutist terms: "Restitution…is an equitable remedy, 'subject to the general equitable principal that [it] is granted to the extent **and only to the extent** that justice between the parties requires…" *United States v. Barnette,* 10 F.3d 1553, 1556 (11th Cir. 1994), *citing Restatement of Restitution,* ch. 8, topic 2, introductory note, at 596 (1936) (*emphasis added*).

The district court's discretion on remand is every bit as broad as equity normally allows. "[A]… determination to order restitution, whether complete, partial, or nominal, is discretionary with the court, and the exercise of such discretion would not be an arbitrary extension of judicial authority." *Department of Employment Security v. Ninth Circuit Court,* 718 P.2d 782, 794 (Utah Sup. Ct. 1986).[4]

For example, in *Texaco Puerto Rico, supra*, gasoline wholesalers obtained an injunction against certain price controls.  The injunction was ultimately reversed, and the government sought restitution of any profits earned by the wholesalers during the period of that injunction.  The district court denied restitution, and the 1st Circuit affirmed--citing, among other factors, the reasonableness of the actual gas charges during the injunction period, the government's bad faith, and the public interest.

The 1st Circuit also stressed that, as an appellate court, it was loathe to disturb the district court's broad discretion in deciding restitution claims:

> Mindful, as we are, that "the very nature of a trial judge's interactive role assures an intimate familiarity with the nuances of ongoing litigation -- a familiarity that appellate judges, handicapped by the sterility of an impassive record, cannot hope to match," [citations omitted], we decline to place a heavy appellate thumb on the scales

---

[4] Although dealing with a Utah criminal statute, the court in *Ninth Circuit Court* cited *Williams v. Wash. Metro. Area Transit Com.,* 415 F.2d 922 (D.C. Cir. 1968), as its support for the above-quoted proposition. *Williams*, in turn, was applying the federal common law on restitution.

of justice and thereby upset the trier's delicate balancing of the competing equities in this unusual situation.

*Texaco Puerto Rico, supra* at 886.   Similarly, the Economic Regulatory Commission denied restitution to affected consumers, and the D.C. Circuit affirmed, after an injunction against certain LNG price controls had been set aside. *Public Service Commission v. Economic Regulatory Commission,* 777 F.2d 31 (1985).  The court found that, while actual LNG prices might have been higher during the injunction period than the enjoined controls allowed, the prices were nonetheless objectively reasonable, and any resultant "enrichment" that the industry may have realized was not, therefore, "unjust."   And, once again, the lynchpin of the D.C. Circuit's decision was the broad discretion afforded the trier of fact in balancing the equities:

> The ERA considered and equitably balanced the relevant factors. The agency's findings that the LNG price was reasonable and that the LNG importers gained no unjust enrichment are supported by substantial evidence. On this record, a reviewing court has no warrant to disturb the agency's exercise of discretion. Accordingly, we uphold the decision of the ERA that, in the circumstances of this case, refunds would not be in the public interest….

*Id.* at 38.

In *Williams v. Wash. Metro. Area Transit Com.,* 415 F.2d 922 (D.C. Cir. 1968) (*en banc*), the D.C. Circuit declined to order full restitution after an injunction barring certain rate increases was set aside, concluding that to do so would risk leaving the regulated company with an inadequate rate of return:

> Since restitution is not a matter of right, but is "ex gratia, resting in the exercise of a sound discretion," it lies within our authority to

direct restitution in an amount less than the whole sum of the increased fares collected under the invalid order, or to deny it altogether, if compelling equitable considerations so dictate. The exercise of such an equitable discretion by this court is by no means an usurpation of the administrative powers of the Commission nor is it an arbitrary extension of judicial authority; it is "mere inaction and passivity in line with the historic attitude of courts of equity for centuries."…[I]n the circumstances of this case it clearly does not offend "equity and good conscience" to permit Transit to retain that part of the fare increase essential to avoidance of an undisputedly unfair return.

*Id.* at 944, 946.

Lastly is the especially apt case of *Thompson v. Washington,* 551 F.2d 1316 (D.C. Cir. 1977).  A public housing agency increased rents, and the tenants sued.  Ultimately, the D.C. Circuit found the increases unlawful, and the tenants moved the district court for restitution of the excessive rents paid.

In denying restitution, the district court relied on the facts that:

(i)     the public agency had applied the rent income to providing tenants with affordable housing. "Certainly," the court held, "it does not offend 'equity and good conscience' to withhold restitution of monies already spent on the tenants' behalf [5] by a non-profit landlord brought into being at the urging of the Government for the advancement of the public interest in adequate housing."; and

---

[5] Many of the Plaintiff Tribes have already twice spent the funds at issue here for the benefit of their low-income Indian tenants – once before the initial recaptures prior to 2008, and once again since HUD paid the judgments in 2015.

> (ii)  the public housing agency was struggling financially, and a restitution order "would aggravate the already serious financial problems" of the authority.

*Id.* 1321, 1322; *see also Frederick County Fruit Growers Association v. McLaughlin*, 703 F.Supp. 1021 (D.D.C. 1989) (Court declined to order full restitution for back wages during a period of time during which the defendant reasonably thought its conduct to be lawful).

One lesson contained in all of these restitution cases is that the district court has both the duty and broad discretion to individually weigh the facts and equities of each individual case.  As the Supreme Court explained in *Lemon v. Kurtzman,* 411 U.S. 192, 200-201 (1973):

> In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. . . . Moreover, . . . equitable remedies are a special blend of what is necessary, what is fair, and what is workable. . . .
>
> In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests. . .

It is to the "practical realities and necessities" of these cases that this memorandum now turns.

**B.  The Equities Here Lie With the Tribes, as Does the Public Interest**

> **(i)**  **Restitution Would Strip Funding from the Rightful Tribal Recipients, and Reallocate it to Tribes Who, Under the NAHASDA Funding Formula, are Not Entitled to It**

Resorting to its well-worn "zero sum game" argument, HUD maintains that "by restoring the wrongful judgment funds to HUD, they will be restored to all IHBG recipient tribes in accordance with each tribe's right to them under NAHASDA." *HUD Motion* at 15.

HUD has it exactly backwards.

To begin with, this Court's 2014-2015 final judgments were not "wrongful" on the merits. To the contrary, the 10th Circuit expressly affirmed this Court's judgments that HUD had illegally recaptured the formula current assisted stock (or "FCAS") funds at issue from the Tribes. The Judgment could not be clearer:

> The orders of the United States District Court for the District of Colorado are affirmed with respect to the characterization of the recaptures as illegal.

*Modoc Lassen Indian Housing Authority v. U.S. Dept. of Housing & Urban Development,* 881 F.3d 1181 at 1199 (10th Cir. Dec. 22, 2017). This case is thus rather unusual in this respect: in virtually all of the cases cited in *Section 1(A), ante*, restitution was denied or limited <u>even though </u>the Court of Appeals had held that the respondent's claim to the money was *substantively invalid*. Here, by contrast, the 10th Circuit has rendered indisputable the proposition that HUD seized the Tribes' funds illegally and should never have had possessed them in the first place.

A restitution order in these cases is impossible unless this Court finds (and it is inconceivable that it would so find) that "equity and good conscience" [6] demand

---

[6] *Texaco Puerto Rico*, *supra* at 873

that HUD be allowed to retrieve its illegally-gotten gain.  Recognizing the perversity of such a finding, HUD retreats to the argument that in a court of equity, sovereign immunity trumps fairness.  *HUD Motion* at 16-17 ("Equitable principles cannot waive sovereign immunity.")

Nobody is talking about waiving sovereign immunity here, and no, the government is not excused from "equitable principles."  The 5th Circuit explained as much in *Lacy v. United States,* 216 F.2d 223 (5th Cir. 1954).  In *Lacy*, the defendant had erected some structures near a TVA powerline, and the government sought an injunction forcing their removal.

The trouble was, the government had never paid the defendant for an easement to build the power line, and it did not offer to do so in its injunction suit.  Since the government refused to do equity in order to get equity, the court refused the injunction:

> The Government when applying for relief in a court of equity is as much bound to do equity as is a private litigant. *United States v. Belt*, D.C., 47 F.Supp. 239, *vacated* 319 U.S. 521, 63 S.Ct. 1278, 87 L.Ed. 1559, *aff'd* 79 U.S.App.D.C. 87, 142 F.2d 761; *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 338, 26 S.Ct. 282, 50 L.Ed. 499; *Daniell v. Sherrill*, Fla., 48 So.2d 736, 737, 23 L.R.A.2d 1410. 'When the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter.' *United States v. The Thekla*, 266 U.S. 328, 339, 340, 45 S.Ct. 112, 113, 69 L.Ed. 313.

*Id.* at 225-26.  Like HUD here, the government argued that because sovereign immunity protected it from being forced to pay for the easement, it was entitled to equitable relief irrespective of the actual equities of the situation.

The court, however, drew the obvious and sensible distinction between: (i) the government's immunity from being forced to pay compensation; and (ii) the preconditions for _anyone_ (including the government) invoking the special powers of a court in equity:

> It is true that that principle cannot be pressed to the extent of waiving the sovereign immunity to suit by way of counterclaim. _United States v. Shaw_, 309 U.S. 495, 502, 60 S.Ct. 659, 84 L.Ed. 888; _In re Greenstreet, Inc_., 7 Cir., 209 F.2d 660, 666; _Oyster Shell Products Corp. v. United States_, 5 Cir., 197 F.2d 1022. The Government, however, is still bound to do equity and, as a condition precedent to relief in this case, either to agree upon and pay to the property owner such compensation as it may owe him or, failing such agreement, to file the necessary proceedings for the ascertainment of such compensation.

_Id._ So, yes, the government was free to not pay for the easement. But until it did, the doors of equity would remain closed.

So, too, should they here.

Moreover, more is involved here than just the incongruity of blessing a wrongful seizure. That is because, once reclaimed, HUD intends to redistribute the Plaintiff Tribes' FCAS funds to other tribes -- tribes that, under the NAHASDA funding formula, are not entitled to them.

Under that formula (and subject to certain refinements not herein relevant), each tribe is entitled to an annual sum of money, computed by:

*first,* by counting the number of homes owned or operated tribe that were built under the U.S. Housing Act of 1937[7] (the FCAS units), and then multiplying that number by the then-current amount the annual operating and maintenance subsidies for that housing stock.  24 C.F.R. §§1000.310-316 and Appendix A, Items 3-4;

*second,* subtracting the total amount of funds distributed for FCAS under the *first* phase from the NAHASDA appropriation for the pertinent fiscal year (the "remainder").  24 C.F.R. §1000.324; Appendix A, Item 4; and

*third,* calculating the tribe's share of the remainder according to the tribe's demonstrated "need" for additional housing assistance under the NAHASDA funding formula.  24 C.F.R. §1000.324; Appendix A, Item 5.  In other words, FCAS funds come "off the top"—*i.e.*, they are awarded to the tribe before any consideration is given to any other tribe's needs

The funds recaptured here were "off the top" FCAS funds.[8]  They belonged to the recipient tribe alone, to take care of its 1937 Housing Act stock.

---

[7] 42 U.S.C. 1437aa, *et seq*., Title II, as added by the Indian Housing Act of 1988 (hereinafter the "1937 Housing Act").

[8] *See, e.g., Tlingit Haida Regional Housing Authority v. U.S. Department of HUD*, Civ. Act. No. 08-cv-00451-RPM ("*THRHA v. HUD*"), Findings and Conclusions and Order for Judgment (June 19, 2014) ("*Findings")* at 3

Most of the FCAS funds recaptured in these cases had been awarded for fiscal years 1998-2001.[9] By virtue of the 10th Circuit's ruling on the merits of these cases, these funds rightfully belonged to the Tribes, and the Tribes had every right to expend them in accordance with NAHASDA.

HUD, however, asserts that, should this Court return these funds to the agency, those funds will be "restored" to other non-litigant tribes. *HUD Motion* at 15. But here is the rub: HUD originally recaptured some $20,711,170 from the Plaintiff Tribes. *HUD Motion* at 11, Table. During the time the recaptures were occurring, the recaptured monies were then redistributed to other tribes. *See* All Tribes AR Vol.1, Tabs 13,15,17,19,21,24 and 26 ("Dear Tribal Leader" letters and accompanying Correction/Challenge logs detailing amounts of recaptured/carry-over funds redistributed in each year). By the time the illegal recaptures were complete, mostly by FY 2007-2008:

- the Plaintiff Tribes had been shorted at total of $20,711,170 from what their aggregate allocations would have been (had HUD obeyed the law, as articulated by the 10th Circuit); while

---

[9] In each of these years, the Tribes reported the amount of FCAS in their respective inventories, and HUD awarded that tribe its FCAS funding accordingly under the *first* part of the NAHASDA funding formula. *See, e.g.*, *THRHA v. HUD*, AR Vol. II, Doc. 23 at pp. 639-645 (THRHA FCAS report and HUD award for FY 2001). In the case of Modoc Lassen Indian Housing Authority, a portion of the funds, $99,361.98, was recaptured in 2003 from a Traditional 1937 Housing Act Indian Housing Grant originally awarded in 1997. *See* MLIHA AR Vol. 2, Tab 31.

- other non-litigant tribes had received a $20,711,170 windfall above what their aggregate NAHASDA allocations would have been (again, if had HUD obeyed the law).

HUD is now asking this Court to employ its equitable powers to recreate that shortfall/windfall imbalance.  No court of equity should ever do that.

    (ii)    **Restitution Would Result in NAHASDA Funds Being Used for Purposes That Were Not Intended by the NAHASDA Funding Formula**

Aside from giving money to the wrong recipients, HUD's request would result in money intended for use in operating and maintaining FCAS houses to be diverted to the so-called "Need" component of the NAHASDA[10] formula. *See* 24 C.F.R. §1000.324.

That would turn NAHASDA on its head.  There is a reason why FCAS funding comes "off the top."   Under the 1937 Housing Act, tribes retained significant responsibilities, including a duty to maintain the home in safe and sanitary condition. 24 C.F.R. §905.428(c)(1995).   Because rent was based on tenants' income, those operating and maintenance costs could not be recovered. Accordingly, HUD provided an annual operating subsidy over the project's life via an "Annual Contributions Contract" ("ACC"). 24 C.F.R. §§905.102, 434 (1995),

In enacting NAHASDA, Congress recognized that tribes needed funds to operate and maintain all their 1937 Act homes. This obligatory funding would

---

[10] Native American Housing Assistance and Self-Determination Act, 25 U.S.C. §§ 4101, *et seq.* (hereinafter "NAHASDA").

become Formula Current Assisted Stock ("FCAS") funding, which, to ensure its adequacy, is, again, taken "off the top."  24 CFR part 1000 Appendix A, ¶¶1 and *see* 24 C.F.R. § 1000.324.

As further assurance the FCAS funding would be adequate, Congress provided that no tribe could receive a NAHASDA grant smaller than its operating and modernization subsidies under the 1937 Act. NAHASDA §302(d)(1)(A).

Having assured sufficient FCAS operating funds, Congress *twice* directed tribes themselves to provide sufficient funding to continue to operate those homes. NAHASDA §203(b) required each recipient owning or operating FCAS to "reserve and use for operating assistance under [NAHASDA §202(1)]… such [grant] amounts as may be necessary to provide for the continued maintenance and efficient operation of such housing." NAHASDA §102(b)(2)(A)(v) also requires tribes to include in their annual housing plans "a description of the manner in which the recipient will protect and maintain the viability of housing owned and operated by the recipient…pursuant to the [1937 Housing Act]."

Thus emerges this Congressional imperative: under NAHASDA, all of Indian country's FCAS must be fully maintained before any funding is allocated to any additional housing development.  And, no matter how you slice it, a restitution order here would result in the allocation of $20,711,170 less in FCAS funding to Indian country than HUD's own formula has determined necessary.

(iii)    **The Public Interest Counsels for Denial of HUD's Motion**

"It cannot be gainsaid that a court asked to dispense equitable remediation should give serious consideration to the public interest." *Texaco Puerto Rico, supra* at 882. The "public interest" in these cases lies with the above-described Congressional policies articulated in NAHASDA. As we have just seen, Congress and HUD have told us that America's Indian housing policy demands that the federal government, and the tribes themselves, first and foremost assure that homes built under the 1937 Housing Act do not suffer from neglect or insufficient funding.

A restitution order here would undermine that policy.

## 2.   HUD's Obstruction of the Fact-Finding Process Makes It Impossible, at This Point, to Determine Whether There Were Suitable Funds "At HUD's Disposal" at Time This Court's Judgments Were Entered

The 10th Circuit has asked this Court to make "factual findings regarding whether, at the time of the district court's order[s], HUD had the relevant funds at its disposal." *Modoc Lassen, supra at* 1198-1199. A finding that no such funds were available is a necessary, but not sufficient, factual predicate to HUD's restitution plea.

Because of HUD's refusal to comply with the Tribes' information requests, we are, unfortunately, a long way away from being able to make any such finding.

HUD devotes a substantial portion of its *Motion* to rehashing the fiscal claims made in *Defendants' Report and Declaration* (March 30, 2018) (the "*HUD Report*"). However, there is still pending the Tribes' May 14, 2018 *Plaintiff's Motion for Additional Information* ("*Tribes' Discovery Motion*"). The *Tribes'*

*Discovery Motion* argues that the *HUD Report* provides only partial, cherry-picked and misleading information regarding the pedigree and amount of funds that were actually "at HUD's disposal" when this Court's judgments were entered.

As just one example: we do know that, in one relevant fiscal year (FY2008), HUD had $17,743,795 in unclaimed and recaptured funds from *prior* fiscal years, while as of September 29, 2014 (after this Court had entered its judgments, but before HUD began paying those judgments), HUD had, in its possession, $145,192,615 in prior years' funds. *Tribe's Discovery Motion* at 8-9. Those HUD-controlled funds were not disclosed in *HUD's Report*, leaving two obvious questions unanswered:

- o The 10th Circuit ruled that any judgment should be paid from funds originating in the same fiscal year as the recapture (in most cases, 2003-2008). How much of these other more-than-adequate HUD funds can be traced to the relevant fiscal years?; and

- o If there is some agency impediment or inconvenience in accessing these other funds, how serious is that problem, such that these funds can, or cannot, be fairly labelled as "in HUD's possession" (*Modoc Lassen, supra* at 1199) or "at HUD's disposal" (*id.* at 1198)?

The Tribes asked these, and 14 other reasonable, pertinent questions in their April 5, 2018 letter to HUD. *Tribes Discovery Motion* at 13-17 and *Attachment 1* thereto. HUD declined to answer, claiming with not inconsiderable hubris, that it,

and it alone, was the arbiter of what was relevant and what must therefore be disclosed. *Id.* at 5 and *Attachment 2* thereto.

In retrospect, the Tribes erred in allowing HUD to call its pleading a "Report,"[11] implying as it does the work of some disinterested third party. The *HUD Report* is in fact a carefully scrubbed piece of advocacy, telling the Court only what HUD wants this Court to know. HUD has no business asking this Court to grant restitution on the basis of such a stilted filing.

### 3.   HUD's Erroneous Claim That the District Court's Equitable Hands are Tied Here, Because Full Restitution is "Necessarily Implied" in the 10th Circuit's Remand is Meritless

HUD claims that, because an order for full restitution is "necessarily implied" in the 10th Circuit's decision, this Court has only a ministerial role to play—rubber-stamping restitution if and when the factual predicate for HUD's sovereign immunity claim is satisfied. *HUD Motion* at 15.

To begin with, HUD's argument sinks of its own weight.[12] Virtually all the cases cited in *Section 1, ante,* involved the court of appeals reversing a monetary judgment and then remanding the case to a District Court or adjudicating agency. And, it will always be the case that, in one sense, a District Court's denial of restitution would render "superfluous" (*HUD Motion at 9*) the Court of Appeals'

---

[11] *Joint Statement in Response to Order,* March 14, 2018 at 3.

[12] Likewise overwrought is HUD's argument that no equities lie on the Tribes' side of the ledger because HUD informed them that they might lose. *HUD Motion* at 8. Litigants always know they might lose, and simply being told as much by one's adversary is hardly reason to alter the equitable balance.

decision.  After all, in these cases, the Court of Appeals had ruled that, if no suitable funds were then available, the Tribes should not have received the judgment money. What right does a trial court have to frustrate the Court of Appeals' disposition of the case by letting the plaintiffs keep that money?

Every right in the world.  First, courts of appeal are not-fact finders, and they carefully draw the line between their role and that of the district courts.  *Crews v. Paine*, 686 Fed.Appx. 540 (10th Cir. 2017); *Tabor v. Hilti*, Inc., 703 F.3d 1206 (10th Cir. 2013).  And, that is doubly true when the issue is one of equitable relief:

> The main [whether to grant restitution] event evokes a different criterion. We review a district court's ultimate decision to grant or withhold an equitable remedy for abuse of discretion. [citations omitted]… Overall, the abuse-of-discretion standard is deferential, see, e.g., *Dopp v. Pritzker*, 38 F.3d 1239, 1253 (1st Cir. 1994), and "not appellant-friendly,"   [citations omitted] The solicitude extended by a reviewing court takes into account that the trial judge, "who has had first-hand exposure to the litigants and the evidence, is in a considerably better position to bring the scales into balance than an appellate tribunal." [citations omitted] For this reason, the court of appeals ordinarily will not find an abuse of discretion unless perscrutation of the record provides strong evidence that the trial judge indulged a serious lapse in judgment.

*Texaco Puerto Rico, supra* at 875.

Moreover, in this case (as well as the others cited in *Section 1, ante*) the Court of Appeals, and this Court, were asking fundamentally different questions. The Court of Appeals was asking whether this Court should have ordered HUD to pay the judgments.  This Court, conversely, is asking whether it would be equitable to order the Tribes to pay the money back to HUD.

In that regard, Justice Cardozo's words in *Atlantic Coast Line* ring dispositive:

> The question [on remand] no longer is whether the law would put him in possession of the money if the transaction were a new one. The question is whether the law will take it out of his possession after he has been able to collect it.

*Atlantic Coast Line, supra,* 295 U.S. at 309.

Finally, the 10th Circuit said nothing expressly about the wisdom or equity of restitution.  It did, however, say something clearly about the sketchy scholarship HUD is practicing here.  It is wrong, that court held, to "necessarily imply" something in a decision that does not address the question. Answering the Tribes' argument that two related cases necessarily rejected HUD's theory on the applicability of 25 U.S.C. §4161 (NAHASDA, §401) to our cases, even though the matter wasn't expressly raised in either case, the majority opinion stated that:

> [I]t doesn't appear that either the parties or the court in *Kansas City* addressed any possible distinction between expending funds and receiving them. In fact, the Tribes acknowledge as much in arguing that *Kansas City* "implicitly" resolves this issue. Aplee. Br. 30.  "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507,511 (1925). Thus, we decline to rely on *Kansas City's* "implicit" answer to the question of § 4161's applicability. Aplee. Br. 30.

*Modoc Lassen, supra* at 1191.

The 10th Circuit did not purport to undertake the careful balancing of equities demanded on a trial court sitting in equity.  That task falls on this Court.

**4.  HUD's Unclean Hands Preclude Restitution**

"It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in **bad** faith or with unclean hands." *Texaco Puerto Rico, supra* at 880 (*emphasis added*).  In *Texaco,* the court refused restitution in substantial part because of the claimant's bad faith.  The case is noteworthy because the instances of bad faith occurred outside the four corners of the litigation, but rather in the "overall course of conduct" of the claimant.  *Id.*  For example, the court cited extra-judicial threats made by the claimant against the plaintiffs years before the claimant sought restitution.  "The past is prologue, and the district court plausibly could find –as it did – that the 1986 meetings were part of the same overall course of conduct that led to the push for restitution six years later." *Id.*

Additionally, the court found that the claimant had taken an "irresponsible" position in the litigation premised not on its putative merits but rather to enhance the claimant's bargaining position." *Id.*

In that light, consider, then, these cases:

o  While aggressively seeking a stay of these cases, HUD is aggressively seeking a quick and quiet Congressional reversal of the 10th Circuit's decision on the merits. Buried in the often-overlooked "general provisions" of the President's FY 2019 proposed budget is a HUD-proposed amendment to NAHASDA that would: (i) first, create a new, unlimited and unilateral right to recapture alleged tribal overfunding; and then (ii) second, excusing

that new summary power from any form of hearing requirement.  "nor shall anything in this Act [i.e. NAHASDA] be construed as requiring a formal hearing procedure…to recoup grant funding." *An American Budget, Appendix,* https://www.whitehouse.gov/wp-content/uploads/2018/02/appendix-fy2019.pdf, p. 598, §244.  In other words, HUD is asking for statutory amendments to NAHASDA to provide it with precisely the kind of summary and unilateral recapture authority that the *Modoc Lassen* majority said did not exist.  Moreover, the proviso would then make this new procedure retroactive to HUD's recapture in these cases by providing that it applies "to offsets completed in prior fiscal years." *Id.  See Plaintiffs' Opposition to Defendants' Motion to Stay,* May 15, 2018 at 3-4.  In its discovery foot dragging, HUD is stalling, and its abuse of the judicial system so that the administration can work its Congressional will is not the kind of conduct that a court of equity should reward.

 HUD seems to have purposefully manufactured an avoidable sovereign immunity issue with respect to the moneys escrowed in the *Blackfeet* and *Tlingit Haida* cases.  To explain: in March, 2008, this court ordered HUD to set aside a specific amount "in FY 2008 funds" to pay any ultimate judgment in the *Blackfeet* and *Tlingit Haida* cases.  In FY 2008, HUD had available $17,743,795 in unclaimed and recaptured funds from prior fiscal years.  *See* p. 17*, ante; Attachment 1 hereto.*

    In any fiscal year (including FY 2008), that fiscal year's funds are comprised of both funds appropriated for that year, ***and*** funds unclaimed or

recaptured from prior fiscal years.   HUD's NAHASDA regulations make this

clear:

> The first step in running the IHBG formula is to determine the
> amount available **for allocation in the Fiscal Year (FY)**. It is
> the sum of:
>     (a) The FY appropriation for the IHBG program less
> amounts in the Appropriations Act mandated for purposes other
> than the formula allocation.
>     **(b) The net amount, if any, made available as a result of
> corrections for over- or under-allocations in prior FYs.**
>     (c) The amount, if any, made available pursuant to
> §1000.536.

24 C.F.R. part1000, Appendix A(1); *emphasis added.*

HUD maintains that, in funding the escrows, it consciously chose to use only

the FY 2008 appropriation, rather than the *equally available* portion of the FY 2008

funds that had been recaptured/carried forward from prior fiscal years.[13] We do not

know how much of the  $17,743,795 in recaptured/carried forward funds disbursed

in FY 2008 originated in any of the *Tlingit Haida* or *Blackfeet* recapture years (*i.e.*

2003-2007), because HUD's March 30, 2018 *Declaration* does not provide that

information.   Nonetheless, the fact is that these recapture years (for which no

sovereign immunity issue exists) immediately preceded FY 2008. Unless and until

HUD proves otherwise, it is therefore likely that most of that $17,743,795 was

comprised of recapture year money—probably including the actual funds recaptured

from Tlingit Haida and Blackfeet tribes.

---

[13] *Plaintiffs' Motion to Produce Additional Information,* May 14, 2018,
*Attachment* 2 at 3 (According to HUD: "[T]he meaning of the record is clear: to
fund the stipulations HUD drew from the FY 2008 appropriation.")

And so, HUD has gratuitously bestowed upon itself an avoidable sovereign immunity issue by choosing one particular specie of funds when other, problem-free funds were equally available to the agency.  HUD's theatrics both cheapen the concept of sovereign immunity and work a disservice on this court.[14]

- o From the outset, HUD has feigned sympathy for other tribes that are not party to this litigation, claiming, *inter alia,* that its goal here is only to ensure that money is "restored to all IHBG recipient tribes in accordance with each tribe's rights under NAHASDA." [15]  *HUD Motion* at 15.  At the same time, however, in its restitution motion HUD asks this court to ignore the intended beneficiary of NAHASDA funds, cynically suggesting that this court should rob Peter to pay Paul. *HUD Motion* at 13-14.

Peter, in this case, is Tlingit Haida and the Blackfeet plaintiffs.  Paul is the Navajo.  Although this Court escrowed certain funds expressly "for Plaintiff's [Tlingit Haida and Blackfeet's] benefit," [16]  HUD now spends an inordinate share

---

[14] The Tribes believe that the 10th Circuit foreclosed HUD's game by posing the pertinent question as "what funds were at HUD's disposal?" rather than "what funds did HUD actually use?"  Clearly, the $17,743,795 was "at HUD's disposal" when it funded the escrows in March 2008.

[15] In the shameful tradition of federal Indian policy, HUD tried has and continues to try to pit Indian tribes against one another. *See e.g.* Angie Debo, *Road to Disappearance,* 102, University of Oklahoma, 1941.  (Federal government employed 776 Creek warriors in its effort to subdue the Seminoles.)  HUD continues to publicly urge that the Plaintiff tribes in asserting their rights under NAHASDA are denying other tribes their due.

[16] *THRHA v. HUD, Final Judgment* at 2.

of its *Motion* asking the Court to instead pass the money to the Navajo. Whether or not HUD is actually attempting to pit the Tribes against each other, HUD's newest brainchild shows just how low, and how utterly unrelated to NAHASDA's purposes, HUD's position in these cases has become.

**5. Any Restitution in These Cases Should be: (i) Reduced by the Attorneys' Fees Expended by Each Tribe in Ending HUD's Practice of Summarily Recapturing Indian Housing Funds; and (ii) Affording Each Tribe a Repayment Schedule Matching the Amount of Time that HUD Retained the Unlawfully Seized Funds**

By this point, we know that federal district courts possess broad discretion in fashioning the equitable remedy of restitution. *Texaco Puerto Rico, supra* at 875. We also know that district courts have not merely the power, but the duty, to: (i) "assess all relevant facts and tailor appropriate relief on a case by case basis"; and (ii) "mould each decree to the necessities of the particular case." *Id.* at 873.

Finally, we know that, however this Court finally balances the equities, any appellate court will be especially loathe to intervene. In upholding the district court' denial of restitution, the 1st Circuit stressed that:

> Where, as here, the customary deference accorded to the trial court as factfinder is augmented by due respect for that court's equitable discretion, appellate courts should hesitate to meddle. In this instance, the judge, who had handled the case from its inception, weighed and balanced the equities, and juxtaposed the parties' rights with painstaking care. Thus, whether or not we, if writing on a pristine page, might have concluded otherwise, we are unable to tease an abuse of discretion out of what is quintessentially a judgment call.

*Id.* at 886.

Nowhere is the power and duty to tailor the equities to the case at bar more appropriate than with respect to the net amount of any restitution.  In *Williams, supra*, the D.C. Circuit refused to order restitution of the full amount of gains realized as a result of an eventually-invalidated rate increase, because to do so would leave the regulated entity with an insufficient rate of return.  "Since restitution is not a matter of right," the court held, it lies within our authority to direct restitution in an amount less than the whole sum…" *Id.* at 943-44.[17]  And, in *Frederick Cty. Fruit Growers Ass'n, supra*, the court cut full restitution for excessive rent roughly in half because, for half the time period, the landlord had acted in good faith.

The uniqueness of these cases, to which any restitution order must be tailored, is that the Tribes won before the 10th Circuit.  That court ruled that HUD had illegally seized the Tribes' FCAS funds.  The decision also put the lie to HUD's contention that it can summarily seize previously-granted Indian housing funds without even the pretext of a hearing.

These victories benefit all of the Indian tribes within the 10th Circuit—no "zero sum" game here.  Every tribe in this circuit now rests easier because the Plaintiff Tribes came along, investing years of time and treasure successfully protecting the rights of all Indian tribes.

---

[17] To go further, courts have denied restitution altogether because doing so would result in an inadequate rate of return or other fiscal hardship on the nonmoving party.  *Texaco P.R., Inc. v. Dep't of Consumer Affairs, supra*; *Pub. Serv. Com v. Econ. Regulatory Admin.*, *supra*; *Thompson v. Washington*, *supra.*

"The hallmarks of equity, after all, have long been flexibility and particularity." *Texaco Puerto Rico, supra* at 874, *citing Lussier v. Runyon*, 50 F.3d 1103, 1110 (1st Cir. 1995).  If fairness counsels for any restitution, it also counsels that the equities *on both sides of the equation* be accommodated "with painstaking care."  *Id.* at 886.  Equity here argues for HUD, not the Tribes, bearing the cost of putting to an end, in this circuit, HUD's imperial treatment of the Indian tribes resident herein.

Further, nothing better articulates the concept of equity than the adage, "fair's fair." [18]  By-and-large, HUD seized the Tribes' housing funds during the years 2002-2008, usually in five equal annual increments.[19]

In all fairness, any restitution should not be payable in less than the five-year increments by which HUD originally seized the money in the first place.

Beyond that, HUD did not actually repay the recaptured funds until this Court issued its 2014-2015 orders. And so, HUD enjoyed the fruits of its illegal seizure for at least 6 years (2008 recaptures returned in 2014) and as many as 13 years (2002 recaptures returned in 2015).  In order to square accounts, and do equity on both sides, any restitution order should incorporate a repayment period of between 6 and 13 years (depending on the date of original seizure).

---

[18] Or, what is good for the goose is also good for the gander.

[19] For example, Turtle Mountain's FCAS funds were seized over the period 2002-2007. TMHA AR Vol. 4, Tab 26; and *Tlingit Haida Findings, n. 8, ante* at 5-6.

**6.  Conclusion**

For the foregoing reasons, HUD's *Motion* should be denied.  If the Court

finds that equity demands some restitution, then:

- the sum due should be net of the attorneys' fees expended by the Tribes in invalidating HUD's summary seizure power in the 10th Circuit; and

- the Tribes should be accorded a 6 to13 year repayment period, depending on the date of the funds' initial seizure by HUD.

DATED:  May 15, 2018                    Respectfully submitted,

                                                       Attorney for Plaintiff

                                                        *s/ Jonathan K. Tillinghast*
                                                       Jonathan K. Tillinghast
                                                       Simpson, Tillinghast, Sorensen &

Sheehan

                                                       One Sealaska Plaza, Suite 300
                                                       Juneau, Alaska 99801
                                                       (907) 586-2559
                                                       jon@stsl.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CERTIFICATE OF SERVICE (CM/ECF)

The undersigned hereby certifies that on May 15, 2018, a true and correct copy
of the above was served via CM/ECF which will send notification of such filing
to the
following e-mail addresses:

timothy.jafek@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the
following non CM/ECF participants in the manner (mail, hand delivery, etc.)
indicated by the nonparticipant's name:

    None

        *s/  Jonathan K. Tillinghast*
        Jonathan K. Tillinghast